UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- X

ASCENT: A SCHOOL FOR INDIVIDUALS WITH
AUTISM, NASSAU SUFFOLK SERVICES FOR THE
AUTISTIC; D.H. and T.H., individually and as next friends
on behalf of their child B.H.; T.D. and A.D., individually
and as next friends on behalf of their child A.D.; P.M.,
individually and as next friend on behalf of her child R.M.;
M.C. and K.C., individually and as next friends on behalf of
their child A.B.; M.H. and F.H., individually and as next
friends on behalf of their child A.H.; and M.C. and M.C.,
individually and as next friends on behalf of their child T.C.,

                                           Plaintiffs,

                                                                 Civil No.:  17 CV 6866

          - against -


NEW YORK STATE EDUCATION DEPARTMENT,
MARYELLEN ELIA, in her official capacity as NEW
YORK STATE COMMISSIONER OF EDUCATION, and
KAREN NELSEN and JULIA NAGLE, in their official
capacities as REGIONAL ASSOCIATES of THE NEW
YORK STATE EDUCATION DEPARTMENT,

                                           Defendants.

-------------------------------------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

SHEBITZ BERMAN &
DELFORTE, P.C.
Frederick J. Berman
Matthew J. Delforte
Jacob S. Claveloux
1325 Avenue of the Americas, 27th Floor
New York, NY 10019
*Attorneys for Plaintiffs*

Plaintiffs Ascent: A School For Individuals With Autism ("Ascent"), Nassau Suffolk Services for the Autistic ("NSSA"), D.H., T.H., T.D., A.D., P.M., M.C., K.C., M.H., F.H., M.C., and M.C. (collectively the "Parent Plaintiffs" and together with Ascent and NSSA the "Plaintiffs") submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint, pursuant to Fed. R. Civ. P. 12(b)(1) and (6.)

## FACTUAL BACKGROUND

Ascent and NSSA operate private schools exclusively for children on the autism spectrum. (Complaint, ¶¶ 22-23.) Ascent and NSSA's students have extreme deviations from typical child development and learning deficits.   (*Id.*, ¶¶ 26-27.) Traditional classroom instruction is therefore ineffective for these students.   (*Id.*) Ascent and NSSA offer highly specialized, non-traditional education programs, based on the principles of applied behavior analysis ("ABA"). These programs are designed exclusively for the population of children with autism they serve, who need intensive learning environments to meet their individualized goals. (*Id.*, ¶ 16-17.)

Some of the critical differences between Ascent's and NSSA's programs and more traditional schools are described in detail in the Complaint. (*Id.* ¶¶ 25-95.)  Briefly stated, ABA focuses on teaching children with autism the essential functional skills they need to improve their quality of life. (*Id.*, ¶ 59.)  These include, by way of example, toileting skills like wiping, menstrual care, and etiquette in the bathroom; dressing skills like putting on a bra, underwear and other items of clothing; and eating, showering and washing. (*Id.*) When a child with autism lacks the necessary motor skills to perform a task, ABA instructors teach the pre-requisite motor skills in discrete parts and practice them repeatedly.  (*Id.*, ¶ 61.)  Once the skills are learned, the student is taught to incorporate these skills into a more complex response sequence. (*Id.*) The

1

curriculum is individualized for each student and employs techniques validated by research; data tracking each student's progress is generated and analyzed daily, so that the effectiveness of instruction can be assessed. (*Id.*, ¶¶ 31-34.)

A key element of applied behavioral analysis is generalization (i.e., the transfer of a learned skill from one task and environment to multiple tasks and environments). (*Id.*, ¶ 46.) It is difficult for children with autism to learn isolated skills in a setting where the behavior does not typically occur, such as a classroom or therapy room, and then apply those skills in a natural setting. (*Id.*, ¶ 64.) For generalization to occur, the skills must be taught in all environments in which the student is going to use them and the students must be taught how to put all the component skills together. (*Id.*, ¶ 65.)

In order to promote generalization, Ascent and NSSA have students move to different settings throughout the day and work on different skills with different instructors. (*Id.*, ¶ 47.) The instructors, New York State certified special education teachers and teaching assistants, are trained generalists and can teach different skills interchangeably. (*Id.*, ¶¶ 43, 48.) This prevents students from associating a single skill with a single time, place, or instructor. (*Id.*, ¶ 48.)

At traditional schools, classroom instruction for students with autism usually is supplemented by so-called "related services", such as physical therapy, occupational therapy and speech and language therapy. (*Id.*, ¶¶ 51-53.) Ascent and NSSA purposefully do not offer related services; rather, the therapeutic goals that related services would address are fully addressed as part of ABA-based curricula and techniques. (*Id.*, ¶ 54.) Ascent and NSSA believe, and the results they have achieved confirm, that ABA-based curricula and techniques are much more effective than traditional related services for the children these schools serve. (*Id.*, ¶ 18, 55-57.) As such, the ABA-based curriculum and techniques completely supplants traditional related

2

services.  (*Id.*, ¶ 18.) The reasons why the ABA-based principles and techniques employed at Ascent and NSSA are so much more effective than related services for the population of autistic students with extreme deficits that they serve are explained in detail in the Complaint. (*Id.*, ¶¶ 51-95.) Those paragraphs also explain why providing related services for some children at school during the school day would be detrimental to all students. *See also, Id.*, ¶¶ 202-222.

All of Ascent and NSSA's students are enrolled pursuant to an individualized education program ("IEP") developed for each student by a Committee on Special Education ("CSE") convened by the student's school district, pursuant to the Individuals with Disabilities Education Act ("IDEA").  (*Id.*, ¶ 154.)  Most of these students previously received related services at their previous schools, with little or no success, and all were placed at Ascent or NSSA because the CSE believed that their ABA-based programs, with no related services during the school day, would benefit the child more than other options. (*Id.*, ¶¶ 153-56.) Accordingly, most of Ascent and NSSA students' IEPs do not require them to receive any related services at all while enrolled at either Ascent or NSSA.  (*Id.*, ¶ 155.)

There are, however, a few Ascent and NSSA students whose parents want or who otherwise require related services.  (*Id.*, ¶ 157.)  Those few students can and do receive the related services mandated by their IEPs, arranged and provided by their school districts, after school either at home or in a therapist's office.  (*Id.*, ¶ 158.) There is nothing unusual about related services being provided after school and by a provider not associated with the students' school; that is done for thousands of students throughout New York State. (*Id.*, ¶ 159.)

The Parent Plaintiffs in this case are all parents of children with autism who are currently enrolled in either Ascent or NSSA.  (Id., ¶¶ 3-8.)  All of those students previously had been placed in more traditional schools, with related services, and they now are making far better

progress at Ascent and NSSA, without related services, than they did in those programs. (*Id.*, ¶¶ 96-133.)

For decades, Defendant New York State Education Department ("NYSED") has been aware that Ascent and NSSA do not offer related services and that their students obtain related services (when required by their IEPs) from their school districts (not their schools) outside of school hours (not during the school day). (*Id.*, ¶¶ 163-65.) NYSED did not take issue with this arrangement until May 2016, when it sent each school a letter claiming that New York law required them to provide related services themselves during the school day. (*Id.*, ¶¶ 166-69.)

In September 2016, Ascent and NSSA met with NYSED to discuss this issue. (*Id.*, ¶ 174.) The schools explained that, according to research, ABA-based curricula and techniques fully address the same needs that related services address but are far more effective for these children. (*Id.*, ¶ 175.) The schools also explained that their ABA-based model is fundamentally different from a related services model, and that requiring them to provide related services at school during the school day would fundamentally impair the effectiveness of the ABA programs. (*Id.*, ¶ 177.) NYSED did not dispute those points but stated that IDEA purportedly requires all schools serving children with disabilities to provide all related services mandated by their students' IEPs during the school day; NYSED also stated that NYSED could not authorize public funding for a school that does not provide related services. (*Id.*, ¶ 178.)

Concurrently, NYSED's Office of Special Education Quality Assurance ("SEQA") commenced a "Focused Review" of Ascent and NSSA. (*Id.*, ¶ 184.) According to the letters giving notice of this programmatic audit, the protocol for the review was "designed to determine if a State-approved private school . . . is in compliance with federal and New York State laws

and regulations regarding the provision of special education programs and services for students with disabilities." (*Id.*)

On July 26, 2017, NYSED issued "Final Audit Reports" that found Ascent and NSSA in "noncompliance" with § 200.6(a)(2) of NYSED's regulations because the schools did not offer related services during the school day. (*Id.*, ¶ 189.) The Final Audit Reports required Ascent and NSSA to take "Required Corrective Action" by "arrang[ing], either through hiring of appropriately licensed/certified related services staff or through contract with appropriately licensed/certified staff to provide all of the related services recommended on the IEPs of the students enrolled in the program." (*Id.*, ¶ 191.) The Final Audit Reports also imposed a deadline of April 30, 2018, by which Ascent and NSSA had to complete those "corrective" actions.

The audit findings are incorrect, as there is no federal or state law that requires any school, as opposed to the school district, to offer related services. (*Id.*, ¶¶ 179-80, 193-95, 253.) Yet, the audit findings leave the schools with a "Hobson's choice". If Ascent and NSSA do not comply with the audit report directives, NYSED could revoke their status as approved providers eligible to receive public funding, as the May 2016 letters and NYSED at the September 2016 meeting explicitly threatened. (*Id.*, ¶¶ 168, 178, 196.) Without public funding, Ascent and NSSA would be forced to close their schools. (*Id.*, ¶ 197.) But on the other hand, if the schools were to comply with NYSED's unlawful directive, the schools would incur expenses for "corrective" actions that would not benefit their students, and more importantly, the schools no longer would be able to provide a true ABA-based program for any students. Rather, they would be forced to offer a hybrid of two incompatible educational models and would become far less effective in addressing the severe deficits that their students have. (*Id.*, ¶¶ 58-95, 201-222.) Indeed, if NYSED's directive were applied uniformly across the State, there no longer would be any fully

ABA-based instruction in New York State. (*Id.*, ¶ 223.) The reasons why the IDEA does not allow this result are set forth in the Complaint. (*Id.*, ¶¶ 254-66.)

The Final Audit Reports also made two other findings at issue in this lawsuit. First, they found both schools out of compliance with State law because their school days purportedly include 30 minutes less instruction than is required. (*Id.*, ¶ 225.) In so doing, NYSED erroneously determined that the 30-minute lunch period, during which the students receive instruction on eating skills critical to their safety, health and social well-being, was not instruction. (*Id.*, ¶¶ 225-38.) The audit reports direct the schools to take corrective action by April 30, 2018 to change their programs to provide 5.5 hours of instruction for school age students,, exclusive of the instructional lunch period. (*Id.*, ¶ 227.) Second, the audit reports find that the schools are "non-compliant" because they do not offer traditional physical education. (*Id.,* ¶¶ 239-51.) They never have offered traditional physical education because that is not appropriate for their students (*Id.*, ¶¶ 244-45), but they do provide ABA-based instruction that addresses needed physical education skills (*Id.,* ¶ 249).

The Final Audit Report findings regarding instructional lunches and physical education not only are not compelled by State Law or IDEA, they are contrary to IDEA (*Id.,* ¶¶ 298-306.) and there is no rational justification for them. (*Id.,* ¶¶ 326-27, 333-34.) Yet, once again, absent court intervention the schools are left with the choice of not complying with the audit report requirements and thereby putting their approved status and very existence at risk, or hurting themselves and their students by changing their programs, at substantial expense, in ways that would not help their students and indeed would deprive them of critical ABA-based instruction. (*Id.*, ¶¶ 307-08.)

Faced with a clear issue of law and threatened with immediate and irreparable harm, Plaintiffs commenced this action. Defendants have agreed to suspend the April 30, 2018 deadline for compliance with the audit findings at issue pending the determination of this lawsuit by this Court.

## ARGUMENT

It is axiomatic that on a motion to dismiss, the court must assume the truth of all facts alleged in the complaint and must liberally construe the complaint in the light most favorable to plaintiff. *In re NYSE Specialists Securities Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *Simms v. City of New York*, 10 CIV 3420, 2011 WL 4344215 (E.D.N.Y. May 19, 2011). All plausible inferences that can be drawn from the facts pleaded that would support the sufficiency of the claim must be made. *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012). While Defendants pay lip service to these well-settled rules, in practice Defendants ignore them, as many of Defendants' positions assume facts contrary to what the Complaint actually alleges.

## POINT I

## PLAINTIFFS HAVE STANDING TO ASSERT EACH OF THEIR CLAIMS

Defendants first argue that Plaintiffs lack standing. That contention is incorrect. "To establish Article III standing a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quotation omitted). *See also, Brooklyn Sch. for Spec. Children v. Crew*, 96 CIV. 5014, 1997 WL 539775, at *10 (S.D.N.Y. Aug. 28, 1997) ("To satisfy the requirement under Article III that a claim involve a 'case or controversy,' a plaintiff need only allege: (1) an

immediate threat of injury; (2) fairly traceable to the defendant's conduct; that (3) a favorable federal court decision would likely redress or remedy." (Quotation omitted.)).

Clearly both the schools and the Parent Plaintiffs face the immediate threat of injury absent intervention by the Court. As explained above, if the schools comply with the audit report directives, they will have to fundamentally alter their instructional programs, and they no longer will be able to offer the fully ABA-based instruction which is their instructional model. However, if the schools do not comply with the audit directives, they risk loss of their approved status and funding, which would result in their closure.

Defendants' contention (Defs. Mem. 16) that the Parent Plaintiffs "lack a live case or controversy" because they don't use related services and therefore would not be affected by the forced introduction of related services to Ascent and NSSA is incorrect. Obviously, the children of the Parent Plaintiffs would be affected if Ascent and NSSA did not comply with the audit findings, lost their funding and closed. This would deprive the Parent Plaintiffs of the schools and educational methods they have chosen for their children. The Parent Plaintiffs would be forced to place their children into (or back into) traditional educational settings with related services (Complaint ¶¶ 198-200.), which already have proven to be detrimental to their development.

If Ascent and NSSA complied with the audit directives, the Parent Plaintiffs still would be harmed because their children no longer would receive the fully ABA-based instruction they need; instead they would receive a less effective hybrid. Contrary to Defendants' characterization that those allegations are made "in conclusory fashion," the Complaint states in detail specifically why even students whose IEPs require no related services would be harmed by compliance with the audit report directives. (*Id.*, ¶¶ 83-86, 93-94, 202-222, 274, 308.)

Defendants' argument simply ignores what the Complaint actually says. The students also would not receive the instructional lunches they now receive and need and would be subjected to a traditional physical education program that would not benefit them and would infringe on their ABA-based instruction. (*Id.*, ¶ 308.)

There can be no doubt that the threat of injury is fairly traceable to Defendants' conduct; indeed, Defendants' conduct is the sole cause of the threat. If this Court awards declaratory and injunctive relief in Plaintiffs' favor, it will completely redress the threatened injuries to Ascent, NSSA, the Parent Plaintiffs and their children. *See Brooklyn Sch. for Spec. Children*, 1997 WL 539775, at *9 ("[I]n the present case, plaintiffs are complaining about a concrete injury that they themselves have suffered as the alleged result of the defendants' failure to abide by the mandate of IDEA. Under these circumstances, as discussed more fully below, plaintiffs are the proper litigants to bring this action."). Thus, all three requirements for standing are met.

The fact that statutory and case law also create standing for a parent to challenge an individualized education program offered by a CSE under the IDEA does not, as Defendants' argue, preclude all other plaintiffs from bringing all other types of challenges related to the IDEA and the provision of educational services to children with disabilities. Another judge in this Circuit has previously rejected this exact argument, holding: "The fact that disabled children and their parents are entitled to bring suits does not disentitle providers from suing, in the event that they meet the requirements for standing under Article III of the Constitution and prudential doctrines adopted by the federal courts." *Brooklyn Sch. for Spec. Children*, 1997 WL 539775, at *9.

*County of Westchester v. New York*, 286 F.3d 150 (2d Cir. 2002), relied on by Defendants, is inapposite on its facts. The plaintiffs in *County of Westchester* all were counties

and county officials.   The District Court had recognized that implied causes of action are available under the IDEA in addition to the express cause of action set forth in §1415, but found no indication in the IDEA statute that it was enacted for the benefit of counties. The Second Circuit merely agreed that there was no statutory intent to benefit counties, 286 F.3d at 153 ("We simply cannot 'confidently conclude' from the text and legislative history of the [IDEA] that Congress intended to create a private right of action in favor of Plaintiffs.  Therefore, we hold that the Counties failed to satisfy their burden of demonstrating that Congress intended to provide them with a private right of action to pursue their claims against the State."). It did not hold, as Defendants contend, that no claim other than one expressly authorized by §1415 can be brought under IDEA by parties that the statute did intend to protect.

In contrast, Ascent and NSSA are not counties; they are special education service providers who provide special education to children with autism for whom CSE's determine their programs are the appropriate way to provide a FAPE as required by IDEA. *Brooklyn School for Spec. Children*, 1997 WL 539775 at *9, noted that, "Providers...form an integral part of the IDEA's statutory framework," and expressly held that since service providers are such an integral part of the statutory framework, IDEA should be read to give providers an implied right to bring claims under IDEA to protect their rights relating to the services they provide under IDEA. For the same reasons the statute implies a right to allow providers to sue for payment for the services mandated by IDEA, as in that case, it also must be read to imply a right to allow providers to sue to protect their rights to continue providing services in the manner mandated by IDEA, as in this case.

Nor can Defendants seriously dispute that IDEA confers a right on the Plaintiff Parents to sue where State action would impair the ability of its providers to deliver their instructional

model in the manner determined by the CSE and needed to effectively educate their children. The Plaintiff Parents and their children are exact persons IDEA was created to benefit. (*Id.*, at *10, stating the "indisputable fact that disabled children and their parents have standing under IDEA").

In sum, each Plaintiff is subject to an immediate threat of injury that is directly (and solely) traceable to Defendants' conduct.   If this Court grants the declaratory and injunctive relief Plaintiffs are requesting, it will completely redress those injuries. Therefore, each Plaintiff has standing to challenge Defendants' conduct.

## POINT II

## PLAINTIFFS' CLAIMS ARE RIPE FOR REVIEW

Defendants' argue throughout their brief that Plaintiffs' claims are not yet ripe because Defendants have not yet acted to enforce the audit findings. That contention is also incorrect.

The Declaratory Judgment Act does "not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *Knife Rights, Inc.*, 802 F.3d at 383.  In certain circumstances, courts will allow a threatened injury to suffice.  This is particularly so in disputes between government and private entities because "[a] plaintiff need not expose himself to liability before bringing suit to challenge the basis of threatened action by the government." *Barry v. City of New York*, 933 F. Supp. 2d 416, 425 (E.D.N.Y. 2013).  "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* (quotation omitted).  "The declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.* (quotations omitted).

11

In the Final Audit Reports, Defendants found Plaintiffs in "noncompliance" with certain state regulations governing private schools that receive public funds for the education of students with disabilities.  Defendants directed Ascent and NSSA to take "Required Corrective Action." Ascent and NSSA believe that the audit findings are contrary to law because, among other things, they directly contradict requirements of IDEA.  (Complaint, ¶¶ 254-65, 298-306.) However, if they fail to take the corrective actions directed by Defendants, they will risk sanctions, including revocation of their program approval status, which would make them ineligible to receive public funding and prohibit CSEs from even making placements at the schools.  Thus, without program approval status and public funding, they would be forced to close their schools. If they do take the "corrective" actions, they will be forced to devote time and money on "corrective" measures they believe are incompatible with, and would greatly impair the effectiveness of, the ABA-based instruction and techniques that are their guiding principles and that their students need.

This is exactly the type of situation in which a threatened injury creates a ripe controversy under the Declaratory Judgment Act. Ascent and NSSA should not be forced to either incur the effort and expense of "corrective" actions they believe are unnecessary and would greatly impair the effectiveness of their schools or risk circumstances that would result in closure. They and the parents of children in their schools are entitled to have this Court determine the parties' respective rights and obligations before they either abandon those rights or incur irreparable harm.

Defendants' reliance on *Matter of East Ramapo Cent. Sch. Dist. v King*, 29 N.Y.3d 938 (2017) is misplaced, as that case is distinguishable for several reasons. First, it was not decided under the federal Declaratory Judgment Act which governs this case. Second, nothing in that

case suggests that the potential harm to East Ramapo would put its very existence at risk, as program revocation and loss of funding would do in this case. To require Plaintiffs to have to wait to sue until NYSED revokes their program approval and cuts off Ascent's and NSSA's funding, so that the schools would be thrown into crisis and would need immediate emergency temporary injunctive relief even to survive long enough for Plaintiffs to bring the lawsuit, is absurd.

Third, in the *East Ramapo* decision it is not clear what, if anything, the State action in that case required East Ramapo to do. In *Gordon v. Rush*, 100 N.Y.2d 236 (2003), the New York Court of Appeals made clear that a government determination that would require a party to incur burden and expense itself is sufficient harm to make the case ripe. In that case, the Court articulated the test for ripeness as being that the government agency has arrived at a decision that inflicts actual concrete injury and that the harm may not be prevented by further administrative action. Under that test, this case clearly is ripe for determination. The Final Audit Reports direct Ascent and NSSA to retain related service providers and physical education teachers and to extend the school day and replace instructional lunches with other instruction, all which require burden and expense to do and in fact would change the entire character of the schools from an ABA-based model to a hybrid model. That is actual concrete harm under the *Gordon* standard. Respondents have not identified any further administrative process by which Plaintiffs can seek relief from the audit report directives.

Fourth, in this case, unlike *East Ramapo*, the government actions were taken by issuance of audit reports clearly delineated as Final Audit Reports. As *New Surfside Nursing Home LLC v. Daines*, 103 A.D.3d 637 (2d Dept. 2013) makes clear, a final audit report is a final government action. *New Surfside* also is instructive in illustrating the dilemma that Defendants' position

would create. In *New Surfside* the Court held that plaintiff's claims were time-barred because plaintiff had not timely challenged the final audit report, but instead had waited until action was taken based on the final audit report. If Plaintiffs had done that in this case, as Defendants claim they must, we have little doubt that Defendants then would contend that the claims are time-barred, and Plaintiffs would risk a determination like that in *New Surfside* that the claims were brought too late.

## POINT III

### PLAINTIFFS HAVE NOT FAILED TO EXHAUST
### ANY APPLICABLE ADMINISTRATIVE REMEDIES

Defendants' contentions that Plaintiffs have not exhausted the administrative appeal process under §1415 of IDEA is off point. Section 1415 requires state educational agencies like NYSED to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." The procedures required by §1415 include:

> (1) An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.
>
> (2)(A) Procedures to protect the rights of the child whenever the parents of the child are not known, the agency cannot, after reasonable efforts, locate the parents, or the child is a ward of the State . . .
>
> (3) Written prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency (A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.
>
> . . .

14

(6) An opportunity for any party to present a complaint (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child . . .

20 U.S.C. §1415(b). In sum, §1415 creates a "bill of rights for parents," ensuring they have due process safeguards—including adequate notice, appropriate hearings, and the right of appeal—when developing their child's individualized education program. *J.G. by Mrs. G. v. Bd. of Educ. of Rochester City Sch. Dist.*, 830 F.2d 444, 445 (2d Cir. 1987).

Ascent and NSSA are schools, not parents, and therefore cannot bring an administrative claim under § 1415. *See Brooklyn School for Special Children v. Crew*, 1997 WL 539775 (E.D.N.Y. 1997) ("Exhaustion of administrative remedies under IDEA is not required where those remedies are inadequate or unavailable, or where resort to such remedies would be futile.") More importantly, none of the Plaintiffs in this case (including the Parent Plaintiffs) are challenging a particular child's individualized education program. The Plaintiffs are challenging NYSED's decision to require Ascent and NSSA to fundamentally change their instructional model in a way that would impair their ability to provide effective ABA-based instruction. Section 1415 does not provide administrative process for a review of this decision.

In fact, Defendants themselves point out that, "Plaintiffs have not alleged that they are unhappy with their IEP" and that, "[i]f they were to become so, the real objects of their ire would be the LEAs responsible for the creation and annual review of their IEPs." (Defs. Mem. at 16-17.) Defendants are correct. And, while it is unclear why Defendants felt the need to raise this point in their motion to dismiss, it helpfully highlights the fact that Plaintiffs are not challenging any student's individualized education program under §1415 of the IDEA and, as discussed above, Plaintiffs were therefore not able or required to exhaust §1415 administrative procedures before commencing this action. *See,* 20 U.S.C.A. § 1415(l) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the

15

Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws **seeking relief that is also available under this subchapter,** the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter." (Emphasis added.)) *See also, J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 114 (2d Cir. 2004) (holding the exhaustion requirement is excused where "the framework and procedure for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process").

Defendants incongruously contend that Plaintiffs do not have a claim under §1415 at all, but then contend that Plaintiffs were nonetheless obligated to follow the administrative process set forth in §1415. Defendants reason that, because §1415 creates a mechanism for parents to challenge their children's individualized education programs, that is the only legal challenge that can ever be brought regarding the IDEA. Section 1415 is not the catch-22 Defendants describe. Section 1415 creates an administrative process for one type of plaintiff (parents) to pursue one category of claims under the IDEA, challenges to the program offered to an individual child, but it does not preclude the pursuit of other types of claims in court. Section 1415 is wholly inapplicable "in these particular circumstances." *Am. Civ. Liberties Union v. Clapper*, 785 F.3d 787, 803 (2d Cir. 2015). As such, Plaintiffs were not required to exhaust §1415's administrative remedies and have stated a justiciable claim in this action.

## POINT IV

## PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF FALL SQUARELY WITHIN THE PARAMETERS OF *EX PARTE YOUNG*

Defendants contend that Plaintiffs' claims under 42 U.S.C. § 1983 are barred by the Eleventh Amendment to the U.S. Constitution. That contention is without merit.

"[T]he Eleventh Amendment immunizes states only from retroactive claims for money damages." *Brooklyn Sch. for Spec. Children*, 1997 WL 539775, at *13. "The Eleventh Amendment does not immunize state officials from prospective claims for injunctive and declaratory relief, even when such claims may potentially affect the state fisc." *Id.* "[S]uits for prospective injunctive relief may, under the doctrine established by *Ex parte Young*, 209 U.S. 123 (1908), proceed against individual officers in their official capacity." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). As is set forth above, Plaintiffs' causes of action all state justiciable claims for declaratory and injunctive relief against NYSED and its officers in their official capacities. These claims fall squarely within the *Ex Parte Young* exception to sovereign immunity.

Defendants' argument that Plaintiffs are not seeking prospective relief is patently absurd. The Final Audit Reports require Ascent and NSSA to take specific actions. This lawsuit seeks a declaration that the positions taken by Defendants in the final audit reports are contrary to law and to enjoin Defendants from taking any action to force Ascent and NSSA to comply with those illegal directives or to penalize them for failing to comply. Plaintiffs' claims for declaratory and injunctive relief are quintessentially prospective and therefore not barred by the doctrine of sovereign immunity. It is difficult to understand why Defendants believe or could believe otherwise.

In addition, §1403 of IDEA expressly states that "[a] State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." Section 1403 further provides that "[i]n a suit against a State for a violation of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as those remedies are available for such a violation in the suit against any public entity other than a State." See *also, Brooklyn Sch. for Spec. Children*, 1997 WL 539775, at *13 ("The Eleventh Amendment is concededly no obstacle to plaintiffs' IDEA claims, as IDEA expressly abrogates the states' sovereign immunity.") As such, none of Plaintiffs' claims are barred by sovereign immunity.

## POINT V

### PLAINTIFFS HAVE STATED A CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE EDUCATION OF INDIVIDUALS WITH DISABILITIES ACT

Defendants' further contention that Plaintiffs have not pleaded a proper claim for a declaratory judgment similarly is baseless. "To state a claim for a declaratory judgment, a plaintiff must allege that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 102 (E.D.N.Y. 2010). "The sole consideration in determining a pre-answer motion to dismiss a declaratory judgment action is whether a cause of action for declaratory relief is set forth, not whether the plaintiff is entitled to a favorable declaration." *Lia v. Saporito*, 909 F. Supp. 2d 149, 169 (E.D.N.Y. 2012), *aff'd*, 541 Fed. Appx. 71 (2d Cir. 2013).

Plaintiffs clearly have pled each element of a claim for declaratory relief. Plaintiffs and Defendants vehemently disagree over whether, under IDEA, Defendants legally can require

Ascent and NSSA to provide related services to their students at their schools during the school day, institute a traditional physical education program and substitute other additional instruction for instructional lunches currently provided. Defendants have issued Final Audit Reports compelling Ascent and NSSA promptly to take those actions, which would severely impair their ABA-based instructional model and would subject them to sanctions, including revoking their status as approved providers eligible for the public funding on which they depend, if they don't comply. Thus, Ascent's and NSSA's rights to continue as providers of a fully ABA-based instruction, and the ability of the children of the Plaintiff Parents to continue to receive the wholly ABA-based instruction that has so benefitted them, is at issue. Declaratory relief is both necessary and appropriate.

Defendants also cursorily argue the merits of the case at Defs. Mem. pp. 16-17. While this is irrelevant to the adequacy of the claim for declaratory judgment, those contentions also are incorrect. Defendants' arguments are based on the same unsupported misconception as NYSED's directives at issue in this case – that IDEA somehow requires Ascent and NSSA to provide related services simply because it requires related services to be part of the overall menu of special education services offered by the Local Educational Agency, which are the school districts for the children Ascent and NSSA serve. That is simply untrue. To the contrary, neither IDEA itself nor any case cited in Defendants' memorandum of law holds, states or even remotely suggests that a special education school (or any school for that matter) must itself (as opposed to the LEA) provide related services to students in the school during the school day for those students with related services on their IEPs. Neither does 8 N.Y.C.R.R. § 200.6(a)(2), the State regulation the Final Audit Reports cite. *See,* Complaint, ¶¶ 193-95. In contrast, cases considering the issue of whether a wholly ABA-based program, without related services, was appropriate

under IDEA have upheld the propriety of such services and ordered tuition reimbursement for such placement. *See, M.H. v. New York City Dept. of Educ.*, 712 F.Supp. 2d 125, 146-52 (S.D.N.Y. 2010); *M.N. v. New York City Dept. of Educ.*, 700 F.Supp.2d 356, 367-68 (S.D.N.Y. 2010).

The reality is that nothing in IDEA prohibits a school district, as opposed to the child's school itself, from providing related services. And nothing in IDEA prevents the school district from providing related services at home or at a therapist's office after school, rather than in school during the school day. Rather, as alleged in paragraph 159 of the Complaint, which must be taken as true on this motion, related services are delivered that way for thousands of students throughout the State. Defendants' position violates both the letter and spirit of IDEA for all the reasons set forth in the Complaint (¶¶ 254-66, 299-306.) Significantly, Defendants do not address those points in their memorandum at all.

### POINT VI

### PLAINTIFFS HAVE STATED A CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 504 OF THE REHABILITATION ACT

"Under §504 of the [Rehabilitation Act], no otherwise qualified individual with a disability in the United States, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Loeffler v. Staten Island U. Hosp.*, 582 F.3d 268, 274–75 (2d Cir. 2009) (quoting 29 U.S.C. § 794(a)). "To establish a *prima facie* violation of the Act, a plaintiff must show that one is: (1) a 'handicapped person' as defined in the RA; (2) 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; (3) excluded from such participation or enjoyment solely by reason of his or her handicap; and (4) being denied participation in a program that receives federal financial assistance." *Id.* at 275.

20

Defendants do not argue that Plaintiffs have not adequately pled the elements of a §504 claim. Rather, Defendants inaccurately contend that Plaintiffs were also required to, but did not, allege "purposeful discrimination, bad faith or gross misjudgment." (Def. Mem. at 20.) That requirement applies only to claims for monetary damages. Courts have held that "**monetary damages** are recoverable only upon a showing of an intentional violation [of §504 of the Rehabilitation Act]." *Loeffler*, 582 F.3d at 275 (emphasis added). The requirement that a plaintiff plead purposeful discrimination or bad faith derives from a series of Supreme Court decisions that (1) found an implied private cause of action under the Rehabilitation Act and (2) held that monetary damages were an appropriate remedy, but only if the violation was intentional. *Franklin v. Gwinnett Cnty. Pub. Schools*, 503 U.S. 60, 74–75 (1992) ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged.") *See also Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 630 (1984) ("[Section] 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for back pay.").

The cases Defendants rely upon are inapposite, because they all involve a §504 claim for monetary damages. *C.L. v Scarsdale Union Free Sch. Dist.*, 744 F3d 826 (2d Cir. 2014) (plaintiffs sought reimbursement tuition paid to a private school); *Y.D. v. New York City Dept. of Educ.*, 14 CIV 01137, 2016 WL 698139 (S.D.N.Y. Feb. 19, 2016) (alleging defendants' conduct violated §504 of the Rehabilitation Act and seeking monetary damages); *Sherman v. Harris*, 11 CIV 4385, 2012 WL 4369766, at *4 (E.D.N.Y. Sept. 24, 2012) ("Rather than seek review of the IHO decision pursuant to Section 722 of the Rehabilitation Act, plaintiff filed this action on

September 9, 2011 alleging various civil rights violations and seeking $4,500,000 in compensatory damages and $4,500,000 in punitive damages.").

Here, in contrast, Plaintiffs seek only declaratory and injunctive relief; they have not made any claims for monetary damages. Plaintiffs are therefore not required to plead or prove intent in order to obtain the declaratory and injunctive relief they seek. *See, Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189 (2d Cir. 2014) (affirming an award of injunctive relief under § 504 of the Rehabilitation Act without requiring the plaintiff to plead or prove intentional discrimination or bad faith).

Even if Plaintiffs were required to plead intentional discrimination or bad faith, which they are not, "intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." *Fair Hous. Just. Ctr., Inc. v. Allure Rehab. Services LLC*, 15CV6336, 2017 WL 4297237, at \*5 (E.D.N.Y. Sept. 26, 2017). Fairly read, the Complaint does allege that Defendants knowingly and intentionally discriminated against the Plaintiff Parents by adopting policies that Defendants knew treated the Plaintiff Parents' children differently from other students, and that Defendants knew that their policies would deprive those children, who have some of the most extensive needs of any students in the State, of the wholly ABA-based instruction they need, would deprive those children of instructional lunches they need, and would impose physical education that would not be appropriate for them. *See,* Complaint ¶¶ 158-59, 174-77, 280-286. Defendants again are ignoring what the Complaint actually says. Those allegations do state a claim that Defendants intentionally discriminated against Plaintiffs; certainly at the very least they allege deliberate indifference to Plaintiffs' rights. If the Court determines otherwise and believes that

discriminatory intent is required and must be pled more specifically, Plaintiffs should be granted leave to amend the Complaint to do so.

In sum, Plaintiffs have pled each of the elements of a §504 claim for declaratory and injunctive relief. Further, Plaintiffs are not required to plead or prove intentional discrimination, but even if they were, the Complaint plausibly alleges that Defendants' policy is intentionally discriminatory. As such, Defendants' motion to dismiss the §504 claims in the Complaint should be denied.

## POINT VII

### THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §1367(a). Thus, district courts are required to exercise supplemental jurisdiction over related state law claims. The only exceptions to this requirement are if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

As is set forth above, Plaintiffs' First, Second, Third, Fifth, and Sixth causes of action all state justiciable claims for declaratory and injunctive relief under various federal laws. None of

those claims have been or should be dismissed.  Plaintiffs' Fourth and Seventh causes of action are brought under New York State law.  The federal law claims predominate over the state law claims in the Complaint. The state law claims not only are closely related to the federal law claims; they are based, in part, on the contention that Defendants' policies and practices were "affected by an error of law" because they were contrary to the same requirements of federal law on which Plaintiffs' federal law claims are based. *See* Complaint, ¶¶ 254-66, 289-90, 299-305, 313-15, 320. Resolution of the state law claims therefore turns in part on an interpretation of federal law. To the extent resolution of Plaintiffs' state law claims also require the interpretation and application of state law, that law is neither complex nor unsettled; the Article 78 standard of review has been well settled and widely applied for decades. The only complex or novel issues of law in this case are federal. Accordingly, none of the exceptions enumerated in 28 U.S.C. §1367(a) applies, and this Court should exercise supplemental jurisdiction over Plaintiffs' state law claims. *See, Corbett v. City of N.Y.*, 1:15 CIV 09214, 2017 WL 3207783, at *12 (S.D.N.Y. July 27, 2017) ("Defendants simply argue that the Court should decline to exercise supplemental jurisdiction because [plaintiff's] federal claims fail as a matter of law.  Because the Court has not dismissed the federal claims at this time, there is no basis to decline supplemental jurisdiction over any of the state-law claims.").

To the extent Defendants contend that a federal court cannot entertain a claim under CPLR Article 78, that contention is incorrect. *See, Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855 (2d Cir. 1988), upholding removal of an Article 78 claim to federal court. There is all the more reason to do so in this case, where the state law claims turn in part on the same federal law issues asserted in the federal law claims.

24

Defendants' further contention at Defs. Mem. 22-23 that laches or estoppel cannot be invoked against a government agency is irrelevant. The Complaint does not assert a claim of laches or estoppel. The portions of the Complaint addressing the inconsistency between Defendants' past practices accepting instructional lunches and the lack of traditional physical education at Ascent and NSSA and Defendants' present positions are citing those facts as one indication, but by no means the only indication, of the arbitrary and capricious nature of Defendants' present positions. To the extent Defendants are contending that NYSED's broad authority over special education is dispositive on the merits of the state law claims, that contention is preposterous. If that were the case, no party ever could bring a claim against NYSED or other government agencies having similar broad regulatory authority. The whole point of CPLR 7803 is that it does impose some limitations on a government agency's discretion: that it cannot act in ways that are contrary to law or lawful procedure or are arbitrary and capricious or an abuse of discretion. The Fourth and Seventh Causes of Action allege with particularity exactly why Defendants' conduct in this case failed to meet those standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss Plaintiffs' Complaint be denied in all respects.

Dated: April 20, 2018
New York, New York

SHEBITZ BERMAN &DELFORTE, P.C.

By: _Frederick J. Berman_
Frederick J. Berman (1570)
Matthew J. Delforte (0071)
Jacob S. Claveloux (6387)
Attorneys for Plaintiffs
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

25